IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BROOKE GARDNER, | ) | CASE NO. 1:18-cv-00096 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Brooke Gardner ("Plaintiff" or "Gardner") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

application for Disability Insurance Benefits ("DIB").  This Court has jurisdiction pursuant to 42

U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report

and Recommendation pursuant to Local Rule 72.2.

For the reasons explained herein, the undersigned recommends that the Court **AFFIRM**

the Commissioner's decision.

## I.  Procedural History

Gardner protectively filed an application for DIB on August 12, 2014, alleging a

disability onset date of October 1, 2013.[1]  Tr. 18, 36-37, 74, 157-158.  He alleged disability due

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about
filing for benefits. It may be used to establish an earlier application date than when we receive your signed
application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 1/2/2019).

1

to osteoarthritis, compressed disc in neck, loose bodies in joints, and depression.  Tr. 74-75, 107, 117, 174.   After initial denial by the state agency (Tr. 107-115) and denial upon reconsideration (Tr. 117-123), Gardner requested a hearing (Tr. 124-126).  A hearing was held before Administrative Law Judge Pamela E. Loesel ("ALJ") on November 8, 2016.  Tr. 33-73.

In her January 30, 2017, decision (Tr. 15-32), the ALJ determined that Gardner had not been under a disability from October 1, 2013, through the date of the decision (Tr. 18, 28). Gardner requested review of the ALJ's decision by the Appeals Council.  Tr. 153-156.  On November 15, 2017, the Appeals Council denied Gardner's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.      Personal, educational, and vocational evidence

Gardner was born in 1969.  Tr. 74, 157.   At the time of the hearing, Gardner was living with his 90-year old mother and 16-year old daughter.  Tr. 40-41.  Gardner was working on obtaining a psychology degree through an online college program but had to stop taking courses because he was unable to focus due to his pain.  Tr. 43-44, 63-64.  At the time of the hearing, Gardner was working third shift at a gas station convenience store.  Tr. 47.  He was averaging 32 to 40 hours per week, making $9.00 per hour.  Tr. 47-48.  Prior to working at the gas station, Gardner was self-employed selling insurance.  Tr. 49-51.  Gardner lost his driver's license for failure to pay child support and then lost his job as an insurance salesman because he could not drive.  Tr. 51, 729.  Gardner's prior work also included security jobs at a downtown Cleveland hotel and at a retirement community.  Tr. 51-58.

**B.     Medical evidence[2]**

    **1.   Treatment history**

On January 10, 2013, Gardner saw Dr. Harkett Sandhu, M.D., with The Center for Orthopedics, for a follow-up visit regarding right shoulder pain. Tr. 299-300. Gardner reported only 20% improvement with physical therapy. Tr. 299. Gardner's shoulder pain was located mainly on the posterior aspect and was aggravated with various range of motion movements. Tr. 299. Gardner was not having neck pain. Tr. 299. Dr. Sandhu ordered an MRI to evaluate for a rotator cuff tear and possible adhesive capsulitis. Tr. 300. On January 22, 2013, per Dr. Sandhu's order, Gardner underwent an MRI of his right shoulder. Tr. 222, 297. On January 28, 2013, Gardner saw Dr. Sandhu for MRI follow up of his right shoulder. Tr. 297. Gardner reported no significant improvement with physical therapy. Tr. 297. He was still having pain, primarily on the lateral aspect and anteriorly over the biceps tendon. Tr. 297. Dr. Sandhu indicated that the MRI revealed a distal supraspinatus tendinosis with a full thickness tear at the distal anterior fibers of the footprint and moderate subacromial bursitis. Tr. 297. Dr. Sandhu administered a cortisone injection into the right subacromial subdeltoid bursa. Tr. 298. Gardner had improvement in his pain following the injection. Tr. 298.

In February 2013, Gardner reiterated that he received a significant amount of relief in his right shoulder from the injection but he was having increased pain and weakness in his right arm and hand. Tr. 295-296. Dr. Sandhu ordered an EMG to rule out any underlying cervical radiculopathy. Tr. 296. Dr. Sandhu showed Gardner some stretching exercises for his right

---

[2] Gardner does not challenge the ALJ's treatment of his alleged mental health impairments. Thus, the medical evidence summarized herein relates primarily to Gardner's physical impairments.

forearm extensor muscles and recommended that Gardner continue with his physical therapy exercises.  Tr. 296.

When Gardner saw Dr. Sandhu in August 2013, Gardner had not had the EMG.  Tr. 293. Gardner complained of increasing pain in his right shoulder and was interested in speaking with someone regarding his surgical treatment options.  Tr. 294.  On September 6, 2013, Gardner saw Dr. Daniel Zanotti, M.D., with The Center for Orthopedics, for an evaluation of his right shoulder. Tr. 291-292.  Gardner had persistent pain down his arm with numbness and tingling into his thumb.  Tr. 291.  Also, Gardner had very limited neck motion and pain in his shoulder blade.  Tr. 291.  Dr. Zanotti noted that MRI imaging showed a small tear but Dr. Zanotti felt that the MRI findings did not correlate with Gardner's pain.  Tr. 292.  Dr. Zanotti recommended a cervical spine MRI and EMG.  Tr. 292.

Gardner saw Dr. Sandhu on October 31, 2013, for follow up after undergoing the cervical spine MRI and EMG.  Tr. 288-290, 414-416.  Dr. Sandhu indicated that the cervical spine MRI confirmed some stenosis with significant foraminal stenosis and the EMG confirmed the same. Tr. 414.  More particularly, Dr. Sandhu indicated that the cervical spine MRI showed mild canal stenosis at L5-S1 due to broad based disc herniation and right-sided extrusion at C5-C6 causing significant neuroforaminal stenosis.  Tr. 415; *see also* Tr. 220-221.  Dr. Sandhu indicated that the EMG confirmed moderate right C6-C7 radiculopathy and involvement of the left C6.  Tr. 415. On physical examination, Dr. Sandhu observed that Gardner had limited range of motion with right and left lateral rotation; no cervical midline tenderness; some mild paraspinal tenderness and some tenderness to the trapezius muscle; good strength of the bilateral deltoid muscles; good strength of the triceps and biceps muscles; and he was neurovascularly intact.  Tr. 415.  Dr. Sandhu diagnosed neck pain, cervical radiculopathy, cervical herniated disc, and rotator cuff

4

tear.  Tr. 415.  Dr. Sandhu felt that most of Gardner's pain was coming from his cervical spine and physical therapy was recommended.  Tr. 415.  Dr. Sandhu prescribed prednisone 50 mg once per day for five days and recommended that Gardner follow up in three to four weeks.  Tr. 415. If Gardner showed no improvement with his range of motion or symptoms, Dr. Sandhu noted that Gardner might be a candidate for surgical intervention.  Tr. 415.

Gardner followed up with Dr. Sandhu on November 19, 2013.  Tr. 285-287, 411-413. Gardner relayed that he was feeling better with regard to his neck and radiculopathy radiating into his right arm.  Tr. 411.  He was, however, starting to have pain in his left elbow for which he had sought emergency room treatment earlier that month.  Tr. 411.  While at the emergency room, he had been prescribed prednisone and he was feeling better and back to his baseline range of motion with some on and off pain.  Tr. 411.  Dr. Sandhu noted that x-rays taken at the emergency room on November 6, 2013, showed left elbow osteoarthritis with possible loose body.  Tr. 412.  Dr. Sandhu observed that the degree of osteoarthritis was unusual considering Gardner's age.  Tr. 413.  Gardner relayed that he had sustained multiple injuries to his elbow while playing football in high school and college.  Tr. 413.  Since Gardner reported significant improvement with regard to his neck and cervical radiculopathy with physical therapy, Dr. Sandhu recommended that Gardner continue with therapy for his neck.  Tr. 413.  Dr. Sandhu also recommended a CT scan of Gardner's left elbow to evaluate for osteoarthritis and loose body. Tr. 413.

The CT scan of Gardner's left elbow was completed on December 16, 2013.  Tr. 216-217.  Gardner saw Dr. Zanotti on January 13, 2014, for follow up.  Tr. 279-281.  Dr. Zanotti noted that the CT scan of Gardner's left elbow showed multiple loose bodies and the x-rays showed some arthritic changes.  Tr. 280.  Dr. Zanotti discussed various treatment options with

Gardner for both his left elbow and neck and shoulder pain.  Tr. 280.  Gardner relayed that he felt that the neck and shoulder pain were still the worst and he was interested in having those issues addressed first.  Tr. 280.  Dr. Zanotti recommended a trial of pain management to determine whether a block at the C5-6 level would help.  Tr. 280.  If a block did not help, Dr. Zanotti indicated that shoulder arthroscopy and rotator cuff repair of the small defect could be considered.  Tr. 280.  Dr. Zanotti felt that the rotator cuff defect was fairly small and did not correlate completely with Gardner's pain which caused Dr. Zanotti to think that some of Gardner's pain was coming from his neck.  Tr. 280.

On March 5, 2014, Gardner saw Heather Scullin, D.O., in the Physical Medicine and Rehab department of Mercy Medical Partners for a pain management evaluation.  Tr. 349-355. Gardner received a number of injections in March 2014.  Tr. 343, 354.  During an April 23, 2014, visit with Dr. Scullin, Gardner relayed that the injections were not very helpful.  Tr. 343. On physical examination during the April 23, 2014, visit, Gardner exhibited normal range of motion in his neck.  Tr. 345.  He had decreased range of motion tenderness in his right and left shoulder, right and left elbow, and cervical back and lumbar back.  Tr. 345-346.  Dr. Scullin recommended occupational therapy for Gardner's right shoulder pain, pain of both elbows, neck pain, and myalgia.  Tr. 346.  She provided a referral to orthopedic surgery for Gardner's right shoulder.  Tr. 346.

Per Dr. Sullin's referral, Gardner attended an occupational therapy orthopedic assessment on April 28, 2014.  Tr. 227-230.  Gardner relayed that he was able to complete his activities of daily living independently, but he required additional time.  Tr. 228.  Gardner reported he was a "power lifter" and had a history of participation in contact sports.  Tr. 228.  Gardner had recently restarted lifting weights but he was using less weight and completing less repetitions as

compared to past workouts. Tr. 228. Gardner was self-employed as an insurance agent. Tr. 228. The physical therapist recommended two to three therapy sessions each week for six to eight weeks. Tr. 229. Gardner was discharged from occupational therapy because he did not return after his initial evaluation. Tr. 231.

Gardner saw Dr. Scullin for follow up on August 20, 2014. Tr. 334-341. On physical examination, Gardner had normal range of motion in his neck, left shoulder, left elbow, and cervical back. Tr. 337. Gardner had a decreased range of motion and tenderness in his right shoulder, right elbow and lumbar back. Tr. 337. Dr. Scullin ordered injections, recommended home exercises, and prescribed a gel to be used in conjunction with medications. Tr. 339-340. Gardner saw Dr. Sandhu on August 22, 2014, for follow up regarding his neck, shoulder and elbow pain. Tr. 276-278. Gardner reported having more pain in his right shoulder. Tr. 276. Dr. Sandhu administered an injection to Gardner's right subacromial subdeltoid bursa. Tr. 276. Dr. Sandhu noted that it had been recommended that Gardner return to physical therapy, but Gardner declined. Tr. 278. Gardner planned to continue with pain management for further injections for his neck. Tr. 278. Gardner planned to follow up with Dr. Zanotti to discuss possible removal of the loose bodies from his elbow to help with his pain and range of motion. Tr. 278.

On September 3, 2014, Gardner saw Dr. Zanotti regarding his right elbow. Tr. 274-275. Gardner complained of pain and popping in his elbow and relayed that he felt that his right elbow was limiting his activity. Tr. 274. Dr. Zanotti assessed mild to moderate right elbow joint disease with multiple loose bodies. Tr. 275. Dr. Zanotti explained that arthroscopy would not resolve any of his underlying arthritic condition which was significant, but Gardner wanted to proceed with diagnostic arthroscopy and loose body removal because the loose bodies could be getting stuck and limiting his activity. Tr. 275.

7

Gardner underwent right elbow arthroscopy with loose body removal and right elbow arthroscopic debridement of elbow joint on September 30, 2014.  Tr. 247-248.  Gardner saw Dr. Zanotti for follow up on October 20, 2014.  Tr. 271-273.  Gardner reported doing well and there was no more catching and locking.  Tr. 271.  Gardner was having issues with his left elbow that were similar to the problems he had been having on his right side.  Tr. 271.  Dr. Zanotti recommended a CT scan of the left elbow and discussed the possibility of proceeding with similar surgery on the left elbow.  Tr. 272.  Also, on October 20, 2014, Gardner attended a physical therapy initial evaluation.  Tr. 308-310.  The physical therapist noted Gardner's loose body removal surgery and that Gardner had arthritis in his bilateral upper extremities from years of being in the military, playing football and power lifting.  Tr. 308.  Gardner complained of difficulty with functional activities such as opening jars/bottles, dressing, putting away dishes, and carrying groceries.  Tr. 308, 309.  Gardner relayed that he enjoyed working out in his basement gym six days per week but he had not been able to do so since his surgery due to increased pain and weakness.  Tr. 309.  The physical therapist observed that Gardner exhibited decreased range of motion, strength and functional use with the right upper extremity.  Tr. 309-310.  The therapist felt that Gardner could benefit from physical therapy to decrease his pain and improve his range of motion, strength and functional use.  Tr. 309.  Gardner was a self-employed insurance agent.  Tr. 309.  Due to the issues with his right upper extremity, Gardner indicated he was currently limited in his ability to perform his job because it entailed a lot of writing and computer work.  Tr. 310.

A CT scan of the left elbow was obtained on November 18, 2014.  Tr. 374-375.  The CT scan impression was no acute fracture or subluxation and prominent marginal spurring throughout the elbow with multiple small varying sized nonacute appearing corticated ossicles

8

adjacent to the coronoid process and olecranon, which might represent detached ostephytes and/or sequala of old trauma.  Tr. 375.  On November 19, 2014, Gardner saw Dr. Scullin for a pain management visit regarding his elbow, neck and shoulder pain.  Tr. 326-332.  On examination, Gardner exhibited normal range of motion in his neck.  Tr. 328.  He exhibited decreased range of motion and tenderness in his shoulders, elbows, and back.  Tr. 328-329.  Dr. Scullin's recommendations included home exercises and injections.  Tr. 331.

Gardner attended physical therapy sessions from October 2014 through early 2015.  Tr. 444-461.  During his therapy sessions, Gardner generally reported improvement in his right elbow but he was having problems with his left elbow and shoulders.  Tr. 444, 446, 448, 450, 452, 454.  During a December 23, 2014, session, Gardner complained that his right shoulder had been bothering him.  Tr. 446.  On physical examination, the therapist noted pain with shoulder testing and "right winging scapula" was noted.  Tr. 447.  The therapist educated Gardner regarding the scapular position and noted that Gardner was continuing with his home workouts with low weight and high repetitions.  Tr. 447.  The therapist suggested that Gardner consider taking a break to allow some inflammation to calm down and to avoid constantly putting stress on his joints but Gardner disagreed.  Tr. 447.

Gardner saw Dr. Zanotti on January 23, 2015, for evaluation of his right shoulder.  Tr. 395-396, 710-711.  Gardner had a known rotator cuff tear and his shoulder had been bothering him more.  Tr. 395.  Gardner's right elbow was doing better but he had irritated it when he got up awkwardly and felt it pop.  Tr. 395, 396.  He also reported problems with his left elbow.  Tr. 395.  On physical examination, Dr. Zanotti noted limited abduction with the right shoulder.  Tr. 396.  Gardner was very apprehensive with shoulder rotation but Dr. Zanotti observed that, when Gardner was distracted, he had decent rotation on the side.  Tr. 396.  He had pain when stressing.

Tr. 396. Gardner was neurovascularly intact distally. Tr. 396. Dr. Zanotti reviewed the diagnostic imaging, noting that the CT scan of the left elbow showed multiple osteophytes throughout the arm with questionable loose body and arthritic changes and was similar to his right. Tr. 396. Gardner was interested in proceeding with rotator cuff surgery. Tr. 396.

On February 17, 2015, Gardner underwent right arthroscopy rotator cuff repair and right shoulder arthroscopic extensor debridement of the glenohumeral joint, labrum, biceps and rotator cuff fraying. Tr. 622-623. At a post-operative visit on February 27, 2015, with a physician assistant, Gardner reported continued pain but indicated he was doing fairly well. Tr. 720. The physician assistant noted that Gardner had good passive range of motion as expected at one week postoperatively. Tr. 721. Gardner had good elbow and wrist motion and was able to make a full fist. Tr. 721. Gardner was provided a prescription for Percocet and a physical therapy referral to start working on range of motion exercises. Tr. 721. Gardner was advised to continue to wear his sling. Tr. 721. Gardner started attending physical therapy. Tr. 433-437, 523-532. During March 2015 therapy visits, Gardner reported pain in his right shoulder, problems sleeping, and difficulty performing activities of daily living. Tr. 433-437, 525.

During an April 1, 2015, post-operative visit with Dr. Zanotti's physician assistant, Gardner relayed that he was continuing to have pain, especially following therapy and at night. Tr. 704-705. On physical examination, Gardner exhibited pain with movement and limited range of motion. Tr. 705. Gardner had forward flexion to 80 degrees with inability to actively hold his arm in that position. Tr. 705. Imaging of Gardner's right shoulder showed good subacromial decompression. Tr. 705. Gardner was provided a prescription for Percocet. Tr. 705. He was advised to continue with therapy and to wean himself out of the sling. Tr. 705.

On May 13, 2015, Gardner sought emergency room treatment because he had fainted and was having pain throughout his body.  Tr. 737-762.  He was discharged the same day with instructions for treating syncope (fainting), tendonitis, and weakness.  Tr. 740.

Upon referral of his primary care provider, Dr. Saadia Hussain, M.D., (Tr. 780, 905-908), on June 11, 2015, Gardner saw Dr. Vagesh M. Hampole, M.D., for evaluation of joint pain and stiffness (Tr. 780-781).  On physical examination, Dr. Hampole observed decreased range of motion in the neck and bilateral elbow flexion and extension; osteoarthritic changes and decreased grip in the hands; and pain with range of motion in the neck, bilateral shoulder abduction, and bilateral elbow flexion and extension.  Tr. 781.  Dr. Hampole prescribed Motrin for Gardner's pain and ordered x-rays of Gardner's hands.  Tr. 781.  The x-rays were negative for fracture, dislocation or significant degenerative changes.  Tr. 768.

Gardner saw Dr. Hampole for follow up on June 25, 2015.  Tr. 778-779.  Gardner reported pain and stiffness in his shoulders and elbows as before and some stiffness in his hands.  Tr. 778.  Physical examination findings were similar to Dr. Hampole's June 11, 2015, findings.  Tr. 778-779.  Dr. Hampole prescribed Voltaren gel for Gardner's painful joints and also recommended Motrin for pain.  Tr.  779.

During an August 7, 2015, follow up with Dr. Hampole, Gardner's complaints and physical examination findings were similar to prior visits.  Tr. 776-777.  Dr. Hampole recommended that Gardner start taking Voltaren XR 100 mg and continue using the Voltaren gel as before.  Tr. 777.  Gardner saw Dr. Hampole on September 18, 2015.  Tr. 918-919.  There was no acute swelling in Gardner's joints, but he was having some pain and stiffness in his shoulders, elbows and hands.  Tr.  918.  Gardner had not been taking the Voltaren XR because of gastric

11

pain and discomfort for the prior two days. Tr. 918. Physical examination findings were similar to prior visits. Tr. 918-919. Dr. Hampole started Gardner on Mobic. Tr. 919.

Gardner saw Dr. Hampole on October 29, 2015. Tr. 916-917. Gardner reported increased pain and stiffness in his neck with no radicular symptoms. Tr. 916. On physical examination, Dr. Hampole noted that Gardner revealed decreased range of motion with pain in his cervical spine; decreased range of motion in shoulders with no acute pain or swelling; his elbows revealed flexion deformities and decreased flexion with pain worse on the left and no acute swelling; his hands revealed osteoarthritic changes; and all other joints of the upper and lower extremities revealed good range of motion, no acute pain on range of motion, and no swelling or deformities. Tr. 917. Dr. Hampole ordered an x-ray of Gardner's cervical spine and continued Gardner on Mobic and the Voltaren gel. Tr. 917. The cervical spine x-ray showed C4 to T1 degenerative disc changes with posterior endplate spurring and bilateral neural foraminal narrowing. Tr. 912.

Gardner saw Dr. Hampole on February 2, 2016. Tr. 914-915. Gardner reported stiffness in his neck, elbows and knees. Tr. 914. Gardner was scheduled to undergo left elbow arthroscopy with Dr. Zanotti on February 16, 2016, to remove loose bodies. Tr. 914. Dr. Hampole's physical examination findings were similar to the October 29, 2015, examination findings. Tr. 915. Dr. Hampole assessed that Gardner's osteoarthritis was stable on Mobic and recommended that Gardner continue Mobic as prescribed. Tr. 915.

On February 16, 2016, Dr. Zanotti performed left elbow arthroscopy with loose body removal, left arthroscopy with limited synovectomy, and debridement of the coracoid fossa. Tr. 840-841, 922-923.

During a June 2, 2016, visit with Dr. Hampole, Gardner reported stiffness in his elbows. Tr. 926.  His joints were stable and there was no acute swelling.  Tr. 926.  On physical examination, Dr. Hampole noted that Gardner revealed decreased range of motion with pain in his cervical spine; good range of motion in shoulders with no acute pain or swelling; his elbows revealed flexion deformities and decreased flexion with pain worse on the left and no acute swelling; his hands revealed osteoarthritic changes; knees revealed good range of motion with crepitus; and all other joints of the upper and lower extremities revealed good range of motion, no acute pain on range of motion, and no swelling or deformities.  Tr. 927.  Dr. Hampole diagnosed polyosteoarthritis and continued Gardner on Mobic.  Tr. 927.

On September 21, 2016, Gardner received emergency room treatment for right flank and knee pain.  Tr. 936-958.  A CT scan of the abdomen and pelvis showed no obstructive uropathy or acute intraabdominal process; a normal appendix; no evidence of diverticulitis; and narrowed L4-5 disc with posterior protrusion of disc.  Tr. 938.   A cervical CT scan showed mild progression of degenerative changes and arthritic disease C1 through C7-T1 with disc space loss since a prior September 6, 2013, scan.  Tr. 939.  The cervical CT scan was negative for acute fracture or subluxation; prevertebral tissues were normal; and there was bilateral foraminal narrowing due to bony hypertrophic changes.  Tr. 939.  Gardner was discharged with instructions for degenerative joint disease and lumbar disc disease and provided a work release form.  Tr. 955.  He was prescribed prednisone and Norco to be used as needed.  Tr. 955.

## 2.  Opinion evidence

There are no opinions from treating sources or consultative examining physicians relating to Gardner's physical impairments.[3]  The state agency reviewing physician opinions are summarized below.

On May 27, 2015, state agency reviewing physician Diane Manos,[4] M.D., completed a physical RFC assessment.  Tr. 83-85.  Dr. Manos opined that Gardner had the RFC to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; limited to occasional push and/or pull bilaterally in the upper extremities; never climb ladders/ropes/scaffolds; occasionally crawl; limited to occasional reaching on the right in front and/or laterally and reaching on the right overhead; and must avoid concentrated exposure to hazards (machinery, heights, etc.).  Tr. 83-85.  Dr. Manos explained that the pushing/pulling and reaching limitations were included to account for Gardner being status post right shoulder rotator cuff repair and right elbow arthroscopy, evidence showing problems with Gardner's left elbow, and limited range of motion and pain with movement on the right.  Tr. 83, 84.

Upon reconsideration, on September 12, 2015, state agency reviewing physician Dimitri Teague, M.D., affirmed Dr. Manos' physical RFC findings.  Tr. 97-99.

---

[3] As discussed below in the analysis section, when the ALJ explained how she assessed Gardner's subjective allegations, the ALJ took into account information Gardner reported to consultative examining psychologist Charles Loomis, Ph.D., as part of Dr. Loomis' April 21, 2015, evaluation.  Tr. 26, 727-735.

[4] In her decision, the ALJ spells Dr. Manos' last name "Marios."  Tr. 27.

14

C.     **Hearing testimony**

1.  **Plaintiff's testimony**

Gardner was represented at and testified at the hearing.  Tr. 39-67.  Gardner's daughter does most of the cooking at home and Gardner has a girlfriend who does the laundry.  Tr. 45. Gardner is able to bathe and dress himself but with some difficulty.  Tr. 45.  Gardner stopped doing yardwork about a year prior to the hearing because, after doing the yardwork for about two hours, he was laid up for three days.  Tr. 46.  Gardner used to be a power lifter but had not done so for years.  Tr. 46.

When working at the gas station, Gardner had to sit for about 20 minutes, every 2 hours. Tr. 48.  The heaviest amount of weight that he had to lift at work was 20 pounds.  Tr. 49.  When Gardner was selling insurance, it started to get difficult for him to focus because he had to sit for long periods of time driving to appointments.  Tr. 50.

When asked what prevents Gardner from working on a full-time basis, Gardner indicated it was the pain in his neck and lower back as well as pain in his feet and toes.  Tr. 59.  For his back and neck pain, Gardner had been receiving injections.  Tr. 59.  Gardner felt that his neck was worse than his back.  Tr. 59.  Gardner indicated he did not like to take pills.  Tr. 60.  He indicated that pain pills make him sick or cause itchiness.  Tr. 65.  Gardner uses Voltaren gel and takes Meloxicam.[5]  Tr. 65.  Gardner had an exercise routine, which included a lot of stretching, so he could move throughout the day.  Tr. 60.  Gardner indicated that his left arm was worse than his right arm.  Tr. 63.  Even after his elbow surgery in February, Gardner could not straighten his

---

[5] Meloxicam is a nonsteroidal anti-inflammatory drug.  *See* https://www.webmd.com/drugs/2/drug-911/meloxicam-oral/details.  Meloxicam is the generic name.  *Id.*  Brand names are Mobic and Vivlodex.  *Id.*

left arm out all the way because of the loose bodies. Tr. 61. He could almost straighten out his right arm. Tr. 63. Gardner has a hard time staying focused because of his pain. Tr. 63-65. His energy level is low. Tr. 65.

### 2. Vocational expert's testimony

Vocational expert ("VE") Deborah Lee testified at the hearing. Tr. 67-72. The VE described Gardner's past work over the prior 15 years. Tr. 68-69. That work included his then current position of cashier, a light, unskilled job; self-employment as an insurance agent (sales agent, insurance), a light, unskilled job; hotel security (house officer), a light, semiskilled job that Gardner performed at the heavy level; and security guard, a light, semiskilled job that Gardner performed at the heavy level. Tr. 68-69.

In response to a hypothetical question reflecting the RFC limitations, the VE indicated that the described individual would be able to perform Gardner's past work of security guard, house officer, and sales agent, as generally performed. Tr. 69-71.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

16

experience, engage in any other kind of substantial gainful work which exists in the national economy[6] . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The

---

[6] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC

and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her January 30, 2017, decision, the ALJ made the following findings:[7]

1. Gardner met the insured status requirements through June 30, 2018.  Tr. 20.

2. Gardner did not engage in substantial gainful activity since October 1, 2013, the alleged onset date.[8]  Tr. 20.

3. Gardner had the following severe impairments: polyosteoarthritis (left and right elbow degenerative joint disease); right shoulder rotator cuff tear and impingement; degenerative disc disease (cervical/lumbar); and headaches. Tr. 20.  Gardner had the following non-severe impairments: fatty liver; marijuana smoker; and asthma.  Tr. 20-21.  Gardner's alleged depression was a non-medically determinable impairment.  Tr. 21.

4. Gardner did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 21-22

5. Gardner had the RFC to perform light work as defined in 20 C.F.R. 404.1567(b), as ability to occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds, ability to stand and walk 6 hours of an 8-hour workday, and sit for 6 hours of an 8-hour workday, with the following additional limitations: push and pull is limited in both upper extremities to occasional; he must never climb ladders, ropes, scaffolds; could occasionally crawl; limited reaching right lateral to occasional; no overhead reaching bilaterally; avoid concentrated exposure to hazards, including unprotected heights.  Tr. 22-27.

6. Gardner was capable of performing past relevant work as a security guard, insurance sales agent, and house officer, as generally performed.  Tr. 27-28.  The work did not require performance of work-related activities precluded by Gardner's RFC.  27-28.

---

[7] The ALJ's findings are summarized.

[8] The ALJ noted that Gardner testified at the hearing that he had been working at a self-serve gas station convenience store for the prior three months, earning $9.00 per hour and working 32 to 40 hours per week.  Tr. 20.

Based on the foregoing, the ALJ determined that Gardner had not been under a disability, as defined in the Social Security Act, from October 1, 2013, through the date of the decision.  Tr. 28.

### V. Plaintiff's Arguments

Gardner contends that the RFC is not supported by substantial evidence, arguing that the ALJ ignored and mischaracterized evidence favorable to Gardner relating to his severe cervical spine degenerative disc disease with radiculopathy, bilateral elbow osteoarthritis, bilateral carpal tunnel syndrome, and right shoulder rotator cuff tear and impingement.  Doc. 12, pp. 3, 12-22.

### VI.    Law & Analysis

**A.    Standard of review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

**B.    The Court should affirm the Commissioner's decision**

Gardner argues that the RFC is not supported by substantial evidence.  Doc. 12, pp. 3, 12-22.  He contends that the ALJ ignored and mischaracterized evidence favorable to Gardner

relating to this severe cervical spine degenerative disc disease with radiculopathy, bilateral elbow osteoarthritis, bilateral carpal tunnel syndrome, and right shoulder rotator cuff tear and impingement.  Doc. 12, pp. 3, 12-22.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record.  20 C.F.R. §§ 404.1545(a)(3), 404.1546(c).

Contrary to Gardner's position, the ALJ did not mischaracterize or ignore evidence.  The ALJ provided a detailed discussion of the evidence, including Gardner's medical treatment history, Gardner's subjective allegations, and his activities of daily living.  Moreover, an ALJ is not required to discuss every piece of evidence.  *See Thacker v. Comm'r of Soc. Sec.*, 99 Fed. Appx. 661, 665 (6th Cir. 2004); *see also Simons v. Barnhart,* 114 Fed. Appx. 727, 733 (6th Cir.2004) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.") (internal citations omitted).   And, as indicated above, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  Thus, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, this Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

Gardner claims that the ALJ mischaracterized the extent of his daily activities because the ALJ did not take into account his testimony that he was a power lifter in the past, not currently, and it was hard for him to complete his activities of daily living.   Gardner's argument is belied by the ALJ's decision itself.  The ALJ specifically discussed Gardner's testimony regarding his daily activities, i.e., "claimant testified his mother takes care of him and his 16-

year-old daughter[,]" claimant "does some cooking, but his daughter does the bulk of the meal preparation[,]" "[h]is girlfriend does his laundry[,]" he can no longer perform yardwork because of the toll it placed on him afterwards.  Tr. 23.  Also, the ALJ noted that Gardner testified that he had stopped power lifting in 1997.  Tr. 23.  The ALJ, however, also considered medical record evidence from an April 2014 physical therapy evaluation which included Gardner's reports that "he was a 'power lifter'" and was continuing to lift weights but had decreased the amount of weight and repetitions as compared to past workouts.  Tr. 24, 228.  As noted above, in assessing whether the Commissioner's decision is supported by substantial evidence, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387.  Thus, to the extent that Gardner attempts to have this Court reconsider or reweigh the evidence regarding the extent of Gardner's daily activities and weight lifting, that attempt should be rejected.

Gardner takes issue with the ALJ's explanation of the October 10, 2013, cervical spine MRI findings.  As reflected in the decision, the ALJ stated that the October 2013 MRI "revealed only mild canal stenosis at L5-S1, due to broad based disc herniation, and a right-sided extrusion at C5-C6."  Tr. 24 (referring to Dr. Sandhu's October 31, 2013, summary of the MRI results, Exhibit 6F/28 (Tr. 415)).  Dr. Sandhu's treatment notes indicate that the MRI showed "some mild canal stenosis . . ." and include the statement that the right-sided extrusion at C5-C6 was "causing significant right neuroforminal stenosis."  Tr. 415.  While the ALJ's statement is not verbatim from Dr. Sandhu's October 31, 2013, treatment notes, it is substantially similar.  Furthermore, the ALJ's reference to Dr. Sandhu's discussion of the October 2013 MRI findings makes clear that the evidence was not ignored.

Gardner also takes issue with the ALJ's description of the October 10, 2013, EMG results.  Again, the ALJ considered and referred to Dr. Sandhu's notes when discussing the EMG results, stating that the EMG study "showed only moderate radiculopathy at C6-C7."  Tr. 24 (citing Exhibit 6F/28 (Tr. 415)).  Gardner points out that the EMG findings also showed involvement of the left C6 root and median nerve compression consistent with mild bilateral carpal tunnel syndrome.  Doc. 12, p. 14 (referring to Tr. 218).  While the ALJ did not note the involvement of the C6 root, the decision makes clear that the ALJ considered the EMG results and Dr. Sandhu's interpretation of those findings, which included a notation that there was involvement of the left C6.  Tr. 415.  Further, while the ALJ did not reference the EMG finding of mild bilateral median nerve compression neuropathy at the wrist consistent with mild bilateral carpal tunnel syndrome, Gardner acknowledges that the findings were consistent with *mild* bilateral carpal tunnel syndrome.  Moreover, Gardner's treating physician Dr. Sandhu did not diagnose carpal tunnel syndrome.  Dr. Sandhu's diagnoses were neck pain, cervical radiculopathy, cervical herniated disc, and rotator cuff tear.  Tr. 415.  Even assuming a diagnosis carpal tunnel syndrome, Gardner has not pointed to a medical opinion setting forth additional functional limitations that should have been included in the RFC to account for mild bilateral carpal tunnel syndrome.

Gardner contends that the ALJ discussed only unremarkable examination findings and did not discuss positive findings in the record, including range of motion limitations in the cervical spine with rotation bilaterally, paraspinal tenderness and tenderness in the trapezius muscles, and decreased bicep tendon reflexes bilaterally.  Doc. 12, pp. 14-15.  Gardner also faults the ALJ for not discussing more fully all of the records concerning his upper extremities.  Doc. 12, pp. 15-16.  Although the ALJ did not mention every examination finding or medical

22

record, the ALJ's decision makes clear that she thoroughly reviewed the record.  Additionally, "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."  *Simons,* 114 Fed. Appx. at 733.  Gardner has not shown that the RFC is unsupported by substantial evidence.  He points to no medical opinion indicating that greater functional limitations than those included in the RFC were necessary to account for the limitations caused by his physical impairments.  In fact, Gardner offers no treating source opinion on the issue.  Moreover, as reflected in the decision, the ALJ considered and assigned great weight to the opinions of the state agency reviewing physicians. The state agency reviewing physicians considered the medical evidence, including the EMG results showing findings consistent with mild carpal tunnel syndrome and physical examination findings (Tr. 79-81, 94-95), and concluded that Gardner had the RFC to perform a reduced range of light work with postural, manipulative and environmental limitations (Tr. 83-85, 97-99), which the ALJ included in the RFC assessment (Tr. 22).

Gardner also contends that the ALJ did not fully address evidence regarding Gardner's elbow impairments and right shoulder impairment.  Doc. 12, pp. 16-20.  As with his other arguments, Gardner's arguments regarding the ALJ's analysis of these impairments and the evidence concerning them amounts to a request that the Court try the case *de novo* or resolve conflicts in evidence, which is not the role of the Court.  Gardner has not shown that the RFC is not supported by substantial evidence.  As indicated, the ALJ's RFC assessment is supported by substantial evidence, including the the opinions of the state agency reviewing physicians.

Gardner also raises a challenge to the ALJ's assessment of his credibility, contending that the ALJ did not properly evaluate the effect of his pain on his overall functioning.  Doc. 12, pp. 20-22.

A claimant's statements of symptoms are not sufficient alone to establish the existence of

a physical or mental impairment or disability.  20 C.F.R. § 404.1529(a); SSR 16-3p, 2017 WL

5180304.[9]   When a claimant alleges impairment-related symptoms, a two-step process is used to

evaluate those symptoms.[10]  20 C.F.R. § 404.1529(c); 2017 WL 5180304, * 2-8.  "An ALJ's

findings based on the credibility of the applicant are to be accorded great weight and deference,

particularly since an ALJ is charged with the duty of observing a witness's demeanor and

credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by

substantial evidence."  *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011)

(citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

Following a detailed discussion of the evidence, the ALJ explained her reasons for

finding Gardner's statements regarding the limiting effects of his symptoms not entirely

consistent with the record.  Tr. 26-27.  The ALJ stated:

> Because a claimant's symptoms can sometimes suggest a greater level of severity
> of impairment than can be shown by the objective medical evidence alone, 20 CFR
> 404.1529(c) and Social Security Ruling 16-3p describe the factors that should be

---

[9]  SSR 16-3p replaces SSR 96-7p and applies to rulings on or after March 28, 2016.  *See* 2017 WL 5180304, at *1, 13.

[10] First, a determination is made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, *e.g*., pain.  SSR 16-3p, 2017 WL 5180304, * 3-4.  Second, once the foregoing is demonstrated, an evaluation of the intensity and persistence of the claimant's symptoms is necessary to determine the extent to which the symptoms limit the claimant's ability to perform work-related activities.  *Id.* at * 3, 5-8.  To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence.  SSR 16-3p, 2017 WL 5180304, * 5-8.  In addition to this evidence, the factors set forth in 20 C.F.R. 404.1529(c)(3) are considered.  *Id.* at *7-8.  Those factors include daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms.  *Id.*  The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  *Id.* at * 10.

considered when assessing the consistency of the claimant's symptoms with the medical evidence. The undersigned should consider the objective medical evidence, statements made by the claimant and other individuals, and others factors, including (1) the claimant's activities of daily living, (2) the location, duration, frequency, and intensity of pain or other symptoms, (3) precipitating and aggravating factors, (4) the type, dosage, effectiveness, and side effects of medications taken to alleviate pain or other symptoms, (5) treatment, other than medication, for relief of pain or other symptoms, (6) any measures other than medication used to relieve pain or other symptoms, and (7) any other factors concerning functional limitations and restrictions due to pain or other symptoms produced by medically determinable impairments, in order to assess the intensity, persistence, and limiting effects of the claimant's symptoms. The undersigned finds multiple inconsistencies between the severity of allegations and the totality of the evidence. For example, the claimant has consistently admitted to relatively robust activities of daily living. In April 2015, he told consultative examiner, Charles Loomis, Ph.D., and chief psychologist, Joan Williams, Ph.D., that he provided some care for his mother and two of his children that resided with her. He reported attending his children's school activities; visiting with family and friends; and going out to eat some (Ex. 13F). At the hearing, he testified he was taking online college courses until recently when he stopped, continued to work a 32 to 40 hour workweek at a convenience store, and was independent with his personal hygiene. The claimant testified he did not like to take pills, so he limited his medication to Meloxicam and Voltaren, a topical ointment for his back and neck pain. It appears the claimant's pain levels are conservatively controlled with meloxicam and topical ointment, such that he is able to function relatively independently. He testified his license was revoked, but apparently gets around well enough to work a near full-time workweek, despite his allegedly disabling impairments. He testified his girlfriend does his laundry; however, in total the record is supportive of relatively robust activities of daily living.

Furthermore, the undersigned has carefully considered the entire record, and while not dispositive of his allegations, there is evidence that the claimant stopped working for reasons not related to the allegedly disabling impairments. During consultative examination, in April 2015, the claimant reported his barriers to employment were his pain symptoms and his transportation difficulties. He further reported that his past employment as an insurance agent ended because his operator's license was revoked, as he had not paid child support (Exs. 13F/7; 14F). The fact that the claimant stopped working for reasons unrelated to his impairments undermines the allegation that he stopped working due to his physical limitations.

In summary, the totality of the evidence fails to support limitations beyond those set forth in the residual functional capacity of less than the full range of light exertion, with postural, reaching, and environmental limitations. The record supports some severe impairments with limitations; however, the severity alleged is not wholly supported for the reasons set forth in detail above. The claimant's treatment history, medical evidence of record, and relatively robust activities of

daily living are not consistent with total disability, as alleged.

Tr. 26-27.

Gardner argues that the ALJ did not adequately assess his credibility because she did not sufficiently discuss all the medications prescribed and used by Gardner during the alleged period of disability. However, as indicated above, the ALJ considered evidence regarding medications used by Gardner. While Gardner had taken Percocet and Darvocet at one point, as noted by the ALJ, Gardner did not like to take pills and used Meloxicam and a topical gel. Tr. 60, 65-66. Gardner indicated that the pain pills made him itch and made him sick. Tr. 65.

In addition to taking into account the medication that Gardner used for his pain, the ALJ considered other evidence as well and Gardner has not shown that the ALJ's assessment of his credibility is not supported by substantial evidence. Gardner may disagree with the ALJ's credibility determination, however, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner,* 745 F.2d at 387. And, the ALJ's decision makes clear that the ALJ fully considered the record and assessed the credibility of Gardner's subjective statements and did not limit his credibility assessment to one piece of evidence. Having reviewed the ALJ's decision and considering that an ALJ's credibility assessment is to be accorded great weight and deference, the undersigned finds that the ALJ's credibility analysis regarding the severity of Gardner's impairments is supported by substantial evidence. Accordingly, even if other evidence were shown to support Gardner's position, reversal and remand is not warranted. *Jones*, 336 F.3d at 477 (Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ.").

## VII. Conclusion and Recommendation

For the reasons discussed herein, the undersigned concludes that the ALJ did not ignore or fail to properly consider the evidence; the ALJ did not err in assessing Gardner's credibility; and the RFC is supported by substantial evidence.  Accordingly, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

January 2, 2019                                          _/s/ Kathleen B. Burke_____
                                                        Kathleen B. Burke
                                                        United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).